## AFFIDAVIT

I, Matthew E. Scalisi, being first duly sworn, depose and state under oath as follows:

## INTRODUCTION

1. Affiant submits this affidavit in support of a criminal complaint charging ABDUL-AZEEM LEVY ("Levy") and DEON D. LEVY ("Deon") (together, "Defendants") with wire fraud, and attempt and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349 (the "Target Offenses"), from on or about May 20, 2020 to on or about June 8, 2020, in the Northern District of Ohio, Eastern Division.

2. Defendants have participated in a scheme to obtain by fraud and interstate wires a loan for more than $550,000 through the Paycheck Protection Program ("PPP") for Apex Now Corp. ("Apex"), to be disbursed to a bank account Levy controls and to which Deon has unlawful access. In order to obtain the loan, which would be fully forgiven with federal government funds, Defendants and their coconspirators appear to applied for the loan in the name of Apex and one of the company's true officers, Person 1. Deon has admitted to doing so without Person 1's consent. In addition, the content of the application included on a fabricated bank account statement and false Internal Revenue Service ("IRS") Forms 941 for Apex. The conspirators falsified the documents to inflate the debits, credits, and balance of the bank account, and inflate Apex's reported payroll expenses, because the payroll determines the size of the PPP loan for which Apex is eligible. In summary, Defendants appear to have viewed the PPP loan as free money, and used Person 1's identity and relied on fabricated documents to support misrepresentations about Apex's business and finances, which maximized the amount of free money Apex would receive for them and they would convert to their own use.

3. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have

1

been since July 7, 2019. As a Special Agent with the FBI, I am assigned to the Complex Financial Crimes Squad. I have obtained extensive training and experience within the FBI on investigating financial crimes leading to federal prosecutions. Prior to becoming a Special Agent with the FBI, I was a Special Agent with the United States Secret Service ("USSS") from July of 2016 to July of 2019. While working out of the Chicago Field Office within the USSS, I was assigned to the Financial Crimes Unit. I have worked on multiple financial crimes cases that involved wire fraud, bank fraud, aggravated identity theft, and other frauds and swindles. Recently, I have been assigned to work with the U.S. Department of Justice and other law enforcement partners to investigate possible fraud associated with the stimulus and economic assistance programs created by the federal government in response to the COVID-19 program.

    4.    As an investigative or law enforcement officer of the United States within the meaning of Section 2501(7) of Title 18, United States Code, I am empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

    5.    This affidavit is based on my personal investigation and investigation by others, including law enforcement officials whom I know to be reliable and trustworthy, as well as my training and experience. The facts contained herein have been obtained by interviewing witnesses and examining documents obtained in the course of the investigation as well as through other means. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## FACTS AND CIRCUMSTANCES REGARDING PROBABLE CAUSE

*The Paycheck Protection Program ("PPP")*

    6.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal

law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

7.  In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

8.  A PPP loan application must be processed by a participating financial institution (the lender). If a PPP loan application is approved, the participating financial institution funds the PPP loan using its own monies, which are 100% guaranteed by Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

9.  PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest

and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time (usually eight weeks of receiving the proceeds) and uses a certain amount of the PPP loan proceeds on payroll expenses.

10. According to the SBA's publicly available website:

   a. PPP loans are "designed to provide a direct incentive for small businesses to keep their workers on the payroll," and they are for certain "entities affected by Coronavirus (COVID-19)."

   b. "The loan will be fully forgiven if the funds are used for payroll costs, interest on mortgages, rent, and utilities," and "at least 75% of the forgiven amount must have been used for payroll."

   c. The amount of the loan for which a given entity is eligible depends in large part on the entity's 2019 "average monthly payroll costs."

*The Fraudulent Scheme*

11. Levy is affiliated with Apex Now Corp. ("Apex") and is the signatory on Apex's business checking account with Fifth Third Bank. On or about May 20, 2020, Apex applied for a $554,232 PPP loan from Cross River Bank in New Jersey, facilitated by BlueVine Corporation in New Jersey. Apex's application was approved, and the funds were then wired from an account outside of Ohio to Apex's Fifth Third Bank account ending in 6891 (the "Fifth Third Account") in Ohio. BlueVine is a financial services company that assists businesses with obtaining access to capital, including by facilitating their applications for PPP loans from participating financial institutions such as Cross River Bank.

12. Records received from BlueVine and Fifth Third Bank confirm that the PPP loan to Apex is based on falsified records and material misrepresentations. Apex's PPP loan

4

application was made by Person 1, represented to be the 100% owner of Apex, and the application provided a phone number and email address for Person 1.  Apex had a listed address on Aurora Road in Solon, Ohio.  The application stated that the purpose of the loan was for "Payroll" and nothing else.  The application directed the loan proceeds to be remitted to the Fifth Third Account.  (Levy is the authorized signatory on the Fifth Third Account, but that is not stated in the application.)

13.  The application included a document that purported to be the February 2020 statement for the Fifth Third Account.  However, that document is an edited version of the true statement for the same account for that month, with changes to the descriptions and amounts of many line entries.  The effect of these edits was to drastically inflate the volume of debits and credits, vastly overstate the balance in the account at all times, and misrepresent the nature of many of the transactions.

14.  In "Total Combined Monthly Average Balance" field, for example, the true statement showed "$13,264.84," while the statement submitted with the application showed "$391,264.80"—meaning it was falsely inflated by nearly 3,000%.  The total value of the checks drawn on the account was changed from $57,349.93 to $110,549.93.  The total value of other debits was changed from $75,998.96 to $173,631.31.  On the other side of the ledger, the total value of deposits and other credits was changed from $132,934.81 to $302,401.81.  The application represented that Apex had ended the month with $362,220.38, but in truth, it ended the month with just $743.72.

15.  Some of the changes to individual line items are also drastic.  For example, an overdraft fee refund credit was edited to appear as a simple deposit, and the amount of the credit was changed from $352 to $25,352.  One of the checks drawn on the account for the month was

5

changed from $134 to $10,134. In addition, a number of line items that appear to be transfers to individuals via the "CASH APP" service were dramatically inflated, such as a $310 payment to a "MR. LEVY" that was changed to a $3,310 payment. The names of some of the payees for those payments were also altered.

16. Based on my training and experience, I believe Defendants made these edits, or caused or permitted these edits to be made, in order to misrepresent Apex as a significant employer with far more payroll expenses, far more business activity, and far more resources than Apex in fact has.

17. The application also included purported IRS Forms 941 ("Employer's Quarterly Federal Tax Return") for all four quarters of 2019. Based on my training and experience, and for the following reasons, I believe these documents are fabricated and false. They show quarterly payroll of more than $665,000 each quarter, for 25 employees—which would mean average annual wages of more $100,000 per employee. Similarly, the PPP loan application states that "Average Monthly Payroll" was $221,693. However, the sum total of all debits from Apex's business account for February 2020 was less than $135,000. Further, as discussed below, Levy recently stated to a person he believed to be a bank compliance officer—who would have access to his true bank records but not to his fraudulent loan application materials—that Apex had only 13 employees and payroll of approximately $80,000 per quarter.

18. After the PPP loan was approved, Cross River Bank wired the $554,232 loan to the Fifth Third Account, but Fifth Third Bank noticed the transaction and placed a hold on the account to allow a review of the transaction. According to a Fifth Third Bank investigator, Deon called the bank repeatedly to inquire about the hold. While Deon is not a signatory on the account or otherwise authorized to access the account, the investigator believed that Deon was

controlling the account. A review of Fifth Third bank ATM surveillance images confirmed that Deon was filmed using the Fifth Third Account at an ATM on or about April 14, 2020.

19. On the morning of June 5, 2020, an undercover investigator (the "UC") posing as a Fifth Third compliance officer conducted a series of recorded calls with Levy, who provided personally identifying information for Abdul-Azeem Levy to confirm his identity. In the first two calls with Levy that morning, Levy was using the same phone number listed as Person 1's contact number on the PPP loan application and on the purported IRS Forms 941 submitted with the application. (That phone number is assigned to a mobile telephone serviced by T-Mobile, but was in Levy's possession, not Person 1's, corroborating Levy's role in preparing the loan application and reinforcing my belief that the Forms 941, which list that number as Person 1's contact information, are fabricated.) During those conversations, Levy initially claimed 100% ownership of the company and affirmed that he had prepared Apex's PPP loan application with help from an individual he did not identify. He said Apex's quarterly payroll was $80,000 for 13 employees across three states. The UC informed Levy that the issue holding up the loan had to do with the fact that Levy controlled the Fifth Third Account, but the PPP loan to Apex had Person 1 listed as the contact. Levy responded that Person 1 was his brother, and was also an owner of Apex. The UC indicated that, to resolve the issue, he wanted to speak with Person 1. Levy responded that he would have Person 1 call the UC.

20. Approximately 10 minutes later, a person representing himself to be Person 1 called the UC's number from a different number with a Virginia area code. During the conversation, the caller provided identifying information of Person 1 to confirm his identity and said that he was the true owner and president of Apex, but that Levy runs Apex's Cleveland office, and had been authorized to open the Fifth Third Account for Apex. The caller claimed

Apex had 30 employees, including both W-2 wage earners and contractors, that total payroll expenses are approximately $80,000-$100,000 per quarter, and that the loan was intended to cover payments to both Apex's employees and its contractors.

21.     Later that day, June 5, 2020, the UC spoke with Levy again about how to resolve the hold on the Fifth Third Account by documenting Person 1's approval of the arrangement. The UC requested that Levy and Person 1 come into a Fifth Third location the following Monday and that they sign forms approving of the disbursement of the loan to the Fifth Third Account. Levy expressed concern about Person 1's ability to attend, saying at one time that Person 1 was leaving town before Monday. Levy proposed as an alternative that he provide a notarized photocopy of Person 1's ID. In a follow-up call, Levy maintained that Person 1 could not come to the bank on Monday, but the UC and Levy agreed that they would attempt to proceed by Levy obtaining a signed and notarized statement by Person 1 expressing his approval of the disbursement, and that Levy would bring that document to the UC at a Fifth Third location in Solon, Ohio the following Monday, at which time Levy himself would also sign forms approving of the arrangement.

22.     On the morning of June 8, 2020, the UC and other investigators were set up to conduct surveillance of Levy's meeting with the UC at the Fifth Third location in Solon, Ohio. Levy and the UC had agreed to meet at approximately 8:30 am. At approximately, 8:25 am, Levy and Deon arrived together in a black Honda CR-V. Deon was driving, Levy was in the front passenger seat, and another individual (believed to be another family member) was in the rear. Deon parked the vehicle in the parking lot, and Levy exited the vehicle and entered the Fifth Third location.

23.     Levy met with the UC inside the bank branch. During the meeting, Levy

8

presented a form that had purportedly been signed by Person 1 in the presence of a notary and notarized, with a copy of Person 1's driver's license. When asked to review some loan application documents, he claimed he did not want to review and approve them without speaking with Person 1, and did not want to call Person 1 in the bank, but would go back to the car (where Deon was waiting) to call Person 1.

24. While Levy was inside, investigators approached Deon in the vehicle and asked to speak with him. During that conversation, Deon admitted that he had been instructing Levy in Levy's participation in the scheme. Deon admitted that he had used Person 1's personally identifying information to cause the application to be made without asking for Person 1's permission. Deon stated that Apex had approximately four employees. Deon denied knowing the details of the loan application.

## CONCLUSION

25. Based on the information provided in this affidavit, I respectfully submit that there is probable cause to believe that ABDUL-AZEEM LEVY and DEON D. LEVY committed the Target Offenses, and to issue the requested arrest warrants.

_____
Matthew E. Scalisi
Special Agent, FBI

Sworn to via telephone after submission by reliable electronic means.
*See* Fed. R. Crim. P. 3, 4(d), and 4.1.

_____ 06-08-2020
Jonathan D. Greenberg
U.S. Magistrate Judge